Filed 10/1/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B325948 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA284216) |
| v. | |
| KWANA HARRIS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge. Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 2009, a jury convicted defendant and appellant Kwana Harris of first degree murder, which a trial court later reduced to second degree murder pursuant to *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).  Harris now appeals from the trial court's order denying her petition for resentencing under Penal Code section 1170.95.[1]  On appeal, Harris argues the trial court had no authority to reconsider its initial order granting her petition; the order denying her petition was not supported by substantial evidence; the trial court applied the wrong legal standard to assess a witness's recantations of trial testimony; and the matter should be remanded because the trial court failed to take her age into account.  In the published portion of this opinion, we conclude the trial court had the authority to vacate and reconsider its initial order granting Harris's resentencing petition.  We affirm the trial court order.

———————————

[1]     All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.) We refer to the law as section 1172.6 for the remainder of this opinion.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

### *Underlying Shooting*

On September 17, 2004, at around 2:30 a.m., Eric "Stoney" Alexander was shot and killed in Los Angeles. A witness who lived nearby heard gunshots and, within less than a minute, walked in the direction of the sound. At the corner of the street, he saw a black SUV about 30 yards from the corner. He saw the SUV's door close as it sped away from the scene.

### *Testimony About Harris's Involvement*

Around one week later, Kwana Harris, her brother Christopher, and others visited James Hardgraves in San Diego.[3] Hardgraves had been married to Harris's late sister.

On the day she arrived, Harris told Hardgraves there were "rumors going around that [Harris] and [Christopher] had killed [Alexander]." Harris indicated she had spoken with Alexander to arrange to meet him, she had "chirped"[4] Alexander to get to the location where he was killed, and she was present when Christopher killed Alexander. After Christopher shot Alexander, Harris kicked Alexander and took his cell phone.

---

[2]    Although the trial court admitted the original trial transcripts as exhibits during the resentencing proceedings, they were not transmitted to this court as part of the record on appeal. We augment the record with the trial transcripts from *People v. Harris* (May 9, 2013, B222583) (nonpub. opn.) on our own motion.

[3]    We refer to some individuals by first name only to avoid confusion. No disrespect is intended.

[4]    "Chirp" or "direct connect" refers to a feature on Sprint Nextel phones that allowed the phone to be used as a walkie-talkie.

Hardgraves admitted at trial that Harris told him she knew that Alexander would be harmed. He confirmed that at the preliminary hearing, defense counsel twice asked Hardgraves if Harris told him she knew Alexander was going to be killed, and Hardgraves responded affirmatively to both questions. Hardgraves further testified that Harris had told him "not to come to court" to testify.

Hardgraves's twin sister, Jamie, was also at his home when Harris visited. She testified she had told police it was possible Harris was driving a black "truck" that weekend. She also overheard a "chirp" phone call between Harris and an unidentified female caller about money that "supposedly had been taken" from someone. Jamie testified that she did not hear any names mentioned on the call, but confirmed that she had told the detective and had testified during the preliminary hearing that Harris and the caller were discussing Alexander. Jamie also heard Harris confirm, in response to the caller's inquiry, that Harris had Alexander's cell phone.

Mericca Garner, the mother of Christopher's son, had also gone to San Diego with Harris and her brother to visit Hardgraves. She carpooled with them in a black "truck," which she later confirmed was an SUV that Harris, Harris's mother, and Harris's sister sometimes drove. At trial, Garner denied she spoke to Harris about Alexander's murder. However, she admitted that in a written statement she signed during a police interview, she wrote that Harris told her "that she didn't find any money and that she drove the truck over there to [Alexander]. . . . Her main concern to me was that she wanted no part of the murder. The cell phone would have made it look like a setup

4

because her name was the last name on the phone.  Far as the money situation, she never found any."

**Cell Phone Records**

The prosecutor produced the "chirp" call records associated with Harris's phone and Alexander's phone from the day of his murder.  The custodian of records for Sprint Nextel testified that in the hour before Alexander's death, his phone sent two or three alerts and made three brief direct connect calls to Harris's phone. The custodian further testified that records associated with Harris's phone reflected Harris made 12 direct connect calls to Alexander's phone in the hour before his death, several of which were made minutes before the shooting.

The defense submitted cell tower records from Alexander's and Harris's phones to show that the two phones were not in the same location after the murder, challenging the prosecution's theory that Harris was present during the shooting and had taken Alexander's cell phone after the shooting.  These records were maintained separately from "chirp" calls and reflected cell site information for regular inbound and outbound phone calls. The prosecution called a Los Angeles Police Department detective who was trained in the analysis of phone records.  He testified that in the 20 minutes after the shooting, call records showed Alexander's phone moved to the same cell site location as Harris's phone.

**Trial and Postconviction Proceedings**

In 2006, the People charged Harris and Christopher with the murder of Alexander.  In October 2009, they were jointly tried.  The jury found Harris guilty of the first degree murder of Alexander.  The court sentenced her to 25 years to life.

In 2014, the California Supreme Court decided *Chiu, supra*, 59 Cal.4th 155. The court held that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Id.* at pp. 158–159.) However, the court also held that "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.) In February 2019, the trial court granted Harris's habeas petition to vacate her sentence pursuant to *Chiu*. The People opted not to retry Harris and agreed to resentencing. The court vacated Harris's 25 years to life sentence for first degree murder and resentenced Harris to 15 years to life for second degree murder.

### *Resentencing Proceedings*

In May 2019, Harris filed a petition for resentencing, which the trial court found made a prima facie showing of eligibility. As explained in further detail below, after an evidentiary hearing, the trial court initially ruled Harris was entitled to resentencing relief, but later vacated its decision. After additional briefing and hearings, the trial court found the People met their burden to establish beyond a reasonable doubt Harris's guilt of second degree murder as a direct aider and abettor. The court therefore denied the petition. Harris timely appealed.

### DISCUSSION

On appeal, Harris contends the trial court had no authority to vacate its original order granting her petition, allow further argument and briefing, and enter a subsequent order denying the petition. Harris also argues the trial court denied her petition based on insufficient evidence, applied the wrong legal standard

6

to assess Hardgraves's recantations of his trial testimony, and failed to consider her youth when determining her mental state. For the reasons explained below, we find no error and affirm the trial court's order.[5]

## I.      Senate Bill No. 1437 and Section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and limited the scope of the felony murder rule.  (*People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)  The bill amended section 188 by adding the requirement that, except as stated in section 189, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)

However, a principal in a murder, including an aider or abettor, may still be criminally liable if that individual personally possesses malice aforethought, whether express or implied. (*People v. Silva* (2023) 87 Cal.App.5th 632, 639–640; *People v. Offley* (2020) 48 Cal.App.5th 588, 595–596 [Sen. Bill No. 1437 did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator' "].)

Senate Bill No. 1437 created a procedure, now codified at section 1172.6, in which a person convicted of a qualifying offense

---

[5]      Because we address the merits of Harris's arguments, we need not resolve whether she forfeited some of the issues on appeal by failing to raise them at the hearing on her petition, or whether this failure constituted ineffective assistance of counsel.

under the former law may seek resentencing if the person could no longer be convicted of that offense under amended section 188. (*Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, *supra*, 10 Cal.5th at p. 847; see also Sen. Bill No. 775 (2021–2022 Reg. Sess.) § 2 [further amending statutory procedures in § 1172.6].)  A person commences the procedure by filing a petition containing a declaration that, among other things, the person could not presently be convicted of murder under the current law.  (*Strong*, *supra*, 13 Cal.5th at p. 708.)  If, after briefing and a hearing, the court determines the petitioner has made a prima facie case for relief, the court shall issue an order to show cause.  (§ 1172.6, subd. (c).)

Within 60 days, " 'the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill No. 1437 . . . .' " (*People v. Njoku* (2023) 95 Cal.App.5th 27, 41; § 1172.6, subd. (d)(1), (3).)  "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."  (§ 1172.6, subd. (d)(3).)  The parties "may also offer new or additional evidence to meet their respective burdens."  (*Ibid.*)

At this stage, "[t]he question is whether the petitioner committed [the underlying crime] under a still-valid theory, and that is a factual question."  (*People v. Clements* (2022) 75 Cal.App.5th 276, 294.)  The trial court is therefore "a fact finder tasked with holding the People to the beyond a reasonable doubt

standard" and " 'must impartially compare and consider all the evidence that was received throughout the entire trial' and determine whether that 'proof . . . leaves you with an abiding conviction that the charge is true.' [Citations.]" (*Id.* at pp. 294–295.) "A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); *Clements*, at pp. 294–297.)

## II.	The Trial Court Had the Authority to Reconsider Its Initial Order Granting Harris's Petition

### A.	Background

#### 1.	Initial evidentiary hearing and trial court ruling

On March 4, 2022, the trial court held an evidentiary hearing on Harris's petition. The court and counsel addressed Harris's objection to the admission of the preliminary hearing and trial transcripts, both of which the court conditionally admitted. They also discussed the effect of the trial court's decision to grant Harris's habeas petition under *Chiu* on its assessment of the People's satisfaction of their burden under section 1172.6. The court and both parties' counsel agreed that if the court granted the petition, the appropriate target offense for resentencing would be assault with a firearm (§ 245, subd. (a)(2)). At the end of the hearing, the court took the matter under submission. It set April 5, 2022, as the date for resentencing, if needed, and told the parties it intended to provide a written ruling before that date.

On March 23, 2022, the court issued a written ruling concluding the evidence fell short of proving beyond a reasonable doubt that Harris acted with malice and finding her entitled to

9

resentencing. The court found that Hardgraves's trial testimony about his conversation with Harris during the family gathering at his home, his testimony that Harris told him not to come to court and someone associated with Harris had threatened him not to testify, and Harris's and Alexander's cell phone records, were "substantial and abundant evidence that Petitioner, Kwana Harris, had the actual intent to kill Eric 'Stoney' Alexander." The court continued:

> "However, . . . Section [1172.6, subdivision (d)(3)] requires more than substantial evidence for the people to carry their burden of proof at the OSC/Evidentiary hearing under [section 1172.6]. The prosecution has the burden of proof to establish beyond a reasonable doubt that Petitioner is guilty of second degree murder. With this burden in mind and the evidence being evaluated in that regard, the court does not find that the [P]eople have carried their burden of proof to establish that the Petitioner is guilty of second degree murder beyond a reasonable doubt. The difficulty is with the finding of the necessary intent.

> "The testimony of James Hardgraves, in addition to noting that Petitioner told him that she knew 'Stoney' was going to be killed before she went to the meeting location, also indicates that she told Hardgraves that she knew Stoney was going to be 'harmed' when she got there. [Record citation omitted.] Although 'killing' is 'harm', 'harm' is not necessarily 'killing.'

> "The testimony of James Hardgraves presents an inconsistency and/or conflict that would conceivably ameliorate the required actual intent

10

necessary to find Petitioner a direct aider and abettor to the murder. However, the testimony does not negate the finding of aiding and abetting an assault or assault with a firearm or deadly weapon, even under a natural and probable consequences theory."

The court stated its intention to resentence Harris on April 5, 2022.

### 2. The People's response and the court's decision to vacate its order

The day before the resentencing hearing, the prosecutor submitted a "Response to the Court's indicated ruling," asserting the ruling mischaracterized Hardgraves's testimony. As the trial court had noted in its ruling, during the trial, the prosecutor asked Hardgraves if Harris had said she knew Alexander would be harmed, to which Hardgraves responded, "Yes." The prosecutor's response to the ruling argued: "There was no reference to the witness previously saying 'harmed' himself, and therefore, this inartful question does not impeach the witness'[s] testimony that the petitioner knew the victim would be killed. . . . The witness endorsed the use of the word 'killed.' The witness did not disagree with the use of the word 'harmed,' but the witness never said that 'killed' was incorrect. Thus the witness endorsed 'harmed' and 'killed,' which are consistent, at different levels of precision, but the witness did not endorse, and was not asked to endorse, the idea that the petitioner expected the victim to be 'harmed but not killed.' Therefore, the proposition that the petitioner knew the victim would be harmed but not killed is without support in the evidence."

At the April 5, 2022, hearing, the court told the parties it was not proceeding with sentencing. The court remarked, "Every time this case is called, I'm brought back to the fact that I'm

11

being asked to rule upon something in which it's necessary for the court to assess the credibility of witnesses, which is extremely difficult to do when you didn't hear the witnesses, and to make a determination as to who was to be believed, who is to be believed, the tenor and nature of what was stated by the witnesses."

The court then indicated it was vacating the prior written order to allow it to hear further argument. The court explained it did not believe that at the evidentiary hearing the parties "actually presented an argument for the court one way or another as to whether the People had carried their burden of proof beyond a reasonable doubt." The court had no position on the prosecutor's response to the prior ruling, but it caused the court to believe it "may have overlooked a very important facet of this ruling, which is to hear from counsel as to whether they believe or do not believe the People have carried their burden of proof and why."

Harris's counsel disagreed, recalling that "both sides talked a lot about it," and argued that the People's filing was an untimely motion to reconsider. The court stated it "[did not] know how to take [the People's] filing" but "wouldn't consider it a motion to reconsider." However, the court then continued: "If you want to address it as a motion to reconsider, you may."

The court explained that in a future hearing, it wanted "to know from the People why they are of the opinion that they have carried their burden of proof beyond a reasonable doubt," with supporting direct and circumstantial evidence, and "why the defense believes that the evidence presented at the trial does not reach the level of the People carrying their burden beyond a reasonable doubt." The court granted defense counsel's request for supplemental briefing. In setting the briefing schedule, the

12

court stated that it did not "need responses and replies. Just give me your best shot, if I may use the legal term."**6**

### 3.     The parties' supplemental briefing

In May 2022, the parties submitted supplemental briefs. In Harris's brief, she asked the court to consider additional statements Hardgraves made, pursuant to section 1172.6, subdivision (d)(3). Specifically, Harris introduced two statements in which Hardgraves purportedly recanted his trial testimony: 1) a 2016 affidavit from Hardgraves and 2) an audio recording and transcript of an undated conversation between Harris's mother or another family member and Hardgraves. In these posttrial statements, Hardgraves claimed his trial testimony was false concerning what Harris told him about Alexander's murder. He asserted he initially lied to detectives about Harris describing her and Christopher's involvement in Alexander's murder. He claimed he then repeatedly provided false testimony because the detectives coerced him, he was at times angry with Harris and

---

**6**     During the hearing, the People notified the court that victims were present in the courtroom who wanted to address the court pursuant to Marsy's Law. (Cal. Const., art. I, § 28, subd. (b)(7)–(8).) On appeal, Harris argues the trial court erred by "implicitly finding that, under Marsy's Law, it could vacate the grant of resentencing so the prosecution could present additional evidence or argument."

Harris misconstrues the court's ruling. The trial court stated that it was vacating its prior order because it did not believe it had heard from counsel about whether the People had met their burden of proof. Because the court was vacating its initial ruling granting the petition, the court found that it had not "issued a ruling at this time that would authorize any resentencing," and therefore the prosecutor's request for victim impact statements under Marsy's Law was premature.

13

her family, Harris's attorney provoked him, and he feared being jailed for perjury. Harris argued that the inconsistencies between Hardgraves's trial testimony and these statements showed Hardgraves was not credible, and therefore his trial testimony could not sustain the People's burden to prove beyond a reasonable doubt that Harris intended to kill Alexander.

In the People's supplemental brief, the prosecutor summarized evidence other than Hardgraves's testimony, such as Garner's testimony and the cell phone records, as evidence of Harris's intent. The brief also challenged Harris's characterization of Hardgraves's trial testimony and argued that retractions of sworn testimony after trial should be viewed with suspicion and given little credence. Harris's responsive brief argued the People could not meet their burden without Hardgraves's testimony. It did not address the weight the court should give Hardgraves's posttrial recantations.

### 4. Further hearings and the order denying the petition

The court conducted further proceedings in August and September 2022. The prosecutor contended Hardgraves's retractions lacked credibility and attempted to "recant" statements he never made at trial. Harris's counsel argued the foundation for Hardgraves's trial testimony about Harris's intent was unclear. Harris's counsel further asserted Hardgraves had the motive to lie at trial because he blamed Harris and her brother for his wife's death. The court again took the matter under submission.

In October 2022, the trial court issued a second written ruling in which it denied Harris's petition. In addition to its description of Hardgraves's testimony from the initial order, the

14

trial court assessed the credibility of Hardgraves's recantations, taking into account how much time had passed before he signed the statements purporting to recant his trial testimony, and Hardgraves's familial relationship with Harris and her family.

The court found that Hardgraves's statements implying the police told him what to say were contradicted by the recording of his police interview. The court further found that Hardgraves's 2016 affidavit and audio-recorded statement purported to recant testimony he had never given and did not disavow important portions of his actual testimony. The court noted Hardgraves did not deny that he had a conversation with Harris at his home in September 2004, and that neither of Hardgraves's subsequent statements "totally recant what he says Petitioner told him in San Diego shortly after the murder," including his testimony that Harris said she knew Alexander was going to be killed. The court also observed that Hardgraves referred to statements in his posttrial recantations that he did not testify to at trial, such as Harris and her brother telling him that they "murdered someone." The court also cited the general principle that recantations of sworn testimony are viewed with suspicion and afforded little credence.

The court concluded the People had proven beyond a reasonable doubt that Harris was guilty of second degree murder as "a direct aider and abettor to the murder of Eric 'Stoney' Alexander and thus had the shared actual intent to kill Alexander." It therefore denied the petition.

### B.    Analysis

Harris contends the trial court had no authority under section 1172.6 to vacate its initial order granting her resentencing petition. She argues the court's act of reconsidering

15

the initial order violated her due process rights and was barred by res judicata. We conclude the court had the inherent authority to reconsider the initial order and did not err or violate Harris's rights by doing so.

As described above, section 1172.6, subdivision (d)(3) sets forth procedures for the evidentiary hearing to determine whether the petitioner is entitled to relief. The subdivision concerns the admission of evidence, indicates the prosecutor and petitioner may offer new or additional evidence to meet their respective burdens, and states that "[i]f the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid*.) While the statute thus contemplates a single evidentiary hearing, it does not address whether the trial court may reconsider a ruling granting a petition prior to resentencing or the entry of an amended judgment.

Harris asserts the trial court could not reconsider its ruling because nothing in the language of section 1172.6 expressly allowed it. But "the inherent powers of the courts are derived from the Constitution and are not confined by or dependent on statute." (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1247–1248 (*Castello*).) That section 1172.6 does not explicitly authorize the trial court to reconsider its ruling is not dispositive on the question of whether it nonetheless has the power to do so.

" '[T]here is little debate that in a criminal cause the court generally has the [inherent] authority to correct its own prejudgment errors.' [Citation.] ' "In criminal cases, there are few limits on a court's [inherent] power to reconsider interim rulings . . . ." . . . [¶] This rule is founded on our preference for

16

justice over the rigid adherence to procedure. "A court could not operate successfully under the requirement of infallibility in its interim rulings. Miscarriage of justice results where a court is unable to correct its own perceived legal errors, particularly in criminal cases where life, liberty, and public protection are at stake. Such a rule would be ' ". . . a serious impediment to a fair and speedy disposition of causes . . . ." ' " ' [Citation.]" (*People v. Konow* (2004) 32 Cal.4th 995, 1020.)

Consistent with this general principle, courts have concluded a trial court may reconsider a variety of orders in criminal proceedings, including: an order dismissing two counts based on an incorrect assumption regarding the statute of limitations (*People v. Nesbitt* (2010) 191 Cal.App.4th 227, 243 (*Nesbitt*)); factual findings made in an order denying a motion to suppress, as requested by the prosecution (*People v. Jackson* (1996) 13 Cal.4th 1164, 1205); an order granting a defense motion for new trial when considering issues of law (*People v. Rose* (1996) 46 Cal.App.4th 257, 263); and a pretrial ruling to correct the court's legal error in granting a motion to suppress (*People v. Ramirez* (1992) 6 Cal.App.4th 1583, 1593).

Courts have also concluded that under some circumstances, a trial court may not reconsider a prior order. In *People v. McGee* (1991) 232 Cal.App.3d 620, the court concluded that after granting the defendant's motion to withdraw his plea, the trial court erred in subsequently granting the People's motion for reconsideration and reinstating the guilty plea. (*Id.* at pp. 625–626.) The *McGee* court characterized the order granting the motion to withdraw as a "final adjudication of the rights or status of a defendant" (*id.* at p. 625), and the court had no jurisdiction to entertain the prosecution's motion to reconsider (*id.* at p. 626). In

17

*Smith v. Superior Court* (1981) 115 Cal.App.3d 285, 287, the court concluded the trial court erred in vacating its order dismissing a prosecution, even though the dismissal was based on erroneous facts.  The order in *Smith* was a "final judgment[ ] on the merits that effectively terminated the prosecution[ ] against the defendant[ ] . . . ." (*Nesbitt, supra*, 191 Cal.App.4th at p. 238.)

In *People v. DeLouize* (2004) 32 Cal.4th 1223 (*DeLouize*), our high court addressed the distinction between interim and final orders when evaluating whether a trial court may reconsider a prior ruling.  The court noted that "[g]enerally speaking, courts may correct judicial error in the making of interim orders or in limine rulings until pronouncement or entry of a judgment.  [Citations.]  On the other hand, judicial error in the making of a final order or judgment 'may not be corrected except pursuant to statutory procedures' or on the limited grounds available for a collateral attack." (*Id*. at p. 1231.)  The question before the court was whether an order granting a new trial is an interim order since it requires further proceedings before judgment may be pronounced.  The appellate courts were split on the question.  (*Id*. at p. 1228.)

The *DeLouize* court reasoned that rather than relying on appealability as the test to determine whether an order is final or interim, courts should "analyze the issue in terms of the policies underlying the general concept of finality." (*DeLouize, supra*, 32 Cal.4th at p. 1232.)  "Because new trials substantially prolong criminal proceedings, allowing trial courts some authority to reconsider and to vacate orders granting new trials may lead to earlier resolution of the matter and thereby promote the interests underlying judicial finality rules." (*Ibid*.)  These include avoiding "the delays and inefficiencies associated with repeated

18

examination and relitigation of the same facts and issues." (*Ibid*.) In *DeLouize*, although the time for an appeal had passed, legal developments that occurred after the trial court initially granted the motion for new trial undercut the legal basis for the motion, and the purpose for having a new trial. As a result, the court concluded in that "unusual situation," the trial court properly entertained the prosecution's motion to reconsider the order granting a new trial. (*Id*. at p. 1233.)

Here, neither party has identified any legal authority directly addressing whether a trial court may reconsider a prior order in a post-judgment resentencing proceeding. However, in addition to *DeLouize*, we find guidance in cases addressing reconsideration in the context of sentencing and other post-judgment litigation.

For example, in *Castello, supra*, 65 Cal.App.4th 1242, the defendant pled guilty to multiple counts of grand theft. (*Id*. at p. 1245.) Prior to the defendant's plea, the trial court denied the defendant's motion to invalidate an out-of-state prior conviction alleged as a strike. (*Ibid*.) When the defendant entered his plea, the trial court found the prior allegation true. (*Ibid*.) A little over one month later, the defendant filed a motion for reconsideration of the validity of the strike prior. (*Ibid*.) The trial court granted the motion and reversed its earlier ruling deeming the prior a strike, then sentenced the defendant. (*Id*. at pp. 1245–1246.) The People appealed, arguing in part that the trial court lacked the power to reconsider its initial ruling. (*Id*. at p. 1246.)

The *Castello* court rejected the People's argument, which was largely based on Code of Civil Procedure section 1008. (*Castello, supra*, 65 Cal.App.4th at p. 1245.) The court explained

19

that "[t]he California Supreme Court has often recognized the 'inherent powers of the court . . . to insure the orderly administration of justice.' [Citations.] In criminal cases, the court has acknowledged 'the inherent power of every court to develop rules of procedure aimed at facilitating the administration of criminal justice and promoting the orderly ascertainment of the truth.' [Citations.]" (*Id*. at p. 1247.) The court referred to *People v. Jackson, supra*, 13 Cal.4th at page 1205, in which the California Supreme Court concluded the trial court's ability to consider the People's motion for reconsideration was " 'controlled by Code of Civil Procedure section 128, subdivision (a)(8), which states that every court will have the power to "amend and control its process and orders so as to make them conform to law and justice." ' " (*Castello*, at p. 1247.)

The *Castello* court further explained that the court's inherent powers are "wide" and are not "confined by or dependent on statute." (*Castello, supra*, 65 Cal.App.4th at pp. 1247–1248.) Those inherent powers "include authority to rehear or reconsider rulings: '[T]he power to grant rehearings is inherent,—is an essential ingredient of jurisdiction, and ends only with the loss of jurisdiction.' [Citations.] ' "One of the powers which has always been recognized as inherent in courts, which are protected in their existence, their powers and jurisdiction by constitutional provisions, has been the right to control its order of business and to so conduct the same that the rights of all suitors before them may be safeguarded. This power has been recognized as judicial in its nature, and as being a necessary appendage to a court organized to enforce rights and redress wrongs." ' [Citations.]" (*Id*. at p. 1248, italics omitted.) Applying these principles, the

20

*Castello* court concluded the trial court had the inherent power to reconsider its prior ruling deeming the out-of-state conviction to be a strike.  (*Id*. at p. 1250.)

In *Jackson v. Superior Court* (2010) 189 Cal.App.4th 1051 (*Jackson*), the appellate court considered whether the trial court had the authority to reconsider an order granting a petition for writ of habeas corpus.  The petitioner filed a petition for writ of habeas corpus on the ground that the prosecution had committed prejudicial *Brady* error by failing to disclose a videotape during pretrial discovery.  (*Id*. at p. 1059.)  The trial court issued an order granting the petition, without specifying the relief the petitioner would receive.  (*Ibid*.)  The People subsequently filed a motion for reconsideration, arguing additional facts had come to light after they filed a return.  The additional facts suggested the defense knew of the existence of the videotape during pretrial discovery.  The People asserted that had they been aware of this information prior to filing a return, they would have argued no evidence was suppressed.  (*Id*. at p. 1060.)  The trial court granted the motion for reconsideration, vacated its prior order, and invited the petitioner to supplement his petition for writ of habeas corpus with additional arguments.  (*Id*. at p. 1061.)  The petitioner filed a petition for writ of mandate in the Court of Appeal, which, at the direction of the California Supreme Court, issued an order to show cause.  (*Ibid*.)

The *Jackson* court noted an order granting a petition for writ of habeas corpus is an appealable order, "analogous to a final judgment," that becomes final once the time for appeal has passed.  (*Jackson*, *supra*, 189 Cal.App.4th at p. 1064.)  The court considered the *Castello* court's reasoning regarding the trial court's wide powers, and also noted a trial court's ability to

21

consider nonstatutory motions to vacate a judgment.  The *Jackson* court thus concluded: "[T]he court had the inherent power to reconsider its order granting the petition for writ of habeas corpus, and that power would only end with its loss of jurisdiction.  [Citation.]  The loss of jurisdiction for purposes of reconsideration of the ruling would occur when the order became final and binding, or when the People filed a notice of appeal from the order. . . .  As the People had not yet filed a notice of appeal when the superior court granted reconsideration, the superior court had retained its inherent power to reconsider and vacate the order granting the petition for writ of habeas corpus." (*Id.* at pp. 1067–1068.)

Applying the reasoning of *Castello*, *Jackson*, and *DeLouize* here, we determine that the trial court's ruling was an interim order the trial court had the inherent power to reconsider. Although the trial court initially ruled Harris was entitled to relief, the court had not yet provided that relief.  Harris had not yet been resentenced; there was no new sentence pronounced or amended judgment entered.  The trial court had not lost jurisdiction over the matter. (*Castello*, *supra*, 65 Cal.App.4th at pp. 1245–1246, 1248 [trial court granted motion for reconsideration prior to sentencing; court has inherent power to grant rehearing that ends only with the loss of jurisdiction].)  As in *Jackson*, the court's order was not yet final and binding.  The time to appeal had not yet passed.[7] (Cal. Rules of Court,

---

[7]    For these reasons, we also reject Harris's argument that the doctrine of res judicata prevented the trial court from reconsidering the ruling granting her resentencing petition. Setting aside that res judicata relates to the conclusive effect a

rule 8.308(a); see *People v. Saibu* (2022) 81 Cal.App.5th 709, 734 [trial court order finding defendant entitled to § 1172.6 relief is appealable under § 1238, subd. (a)(6)].)  Further, while any motion for reconsideration necessitates additional proceedings, the trial court's reconsideration of an order granting a section 1172.6 petition, prior to resentencing, does not suggest a risk of the parties falling into a cycle of endless litigation. (*DeLouize*, *supra*, 32 Cal.4th at p. 1232; *Nesbitt*, *supra*, 191 Cal.App.4th at p. 243 [reconsideration of trial court order dismissing two counts based on incorrect assumption about statute of limitations did not offend policies underlying concept of finality of judgments; did not involve delay or inefficiencies associated with repeated examination and relitigation of same facts and issues].)

The authorities Harris cites do not call for a different result.  Harris relies on *People v. Flint* (2022) 75 Cal.App.5th 607 (*Flint*), for the proposition that the People may not have a " 'second bite at the apple,' " and due process principles preclude the People from having a "re-do."  However, the court in *Flint* did not consider the trial court's authority to reconsider a ruling granting a section 1172.6 petition following an evidentiary

_____

*former judgment* has in *successive litigation* (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 866–867), the preclusion doctrines require a final judgment or order.  When a judgment is "still open to direct attack by appeal or otherwise, it is not final and the doctrines of res judicata and collateral estoppel do not apply."  (*National Union Fire Ins. Co. v. Stites Prof. Law Corp.* (1991) 235 Cal.App.3d 1718, 1726.)  Indeed, "a court's rulings on motions are not irrevocably cast in concrete and a decision on a motion is not ordinarily res judicata."  (*People v. Lopez* (1981) 116 Cal.App.3d 600, 604.)

hearing. Instead, the *Flint* court addressed the preclusive effect of the jury's findings from the original trial.

In *Flint*, the defendant argued he was entitled to "immediate" resentencing, without an evidentiary hearing, under section 1172.6, subdivision (d)(2). (*Flint*, *supra*, 75 Cal.App.5th at p. 613.) Under subdivision (d)(2), "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." The jury at Flint's original trial found not true a felony murder special circumstance, "which required proof that Flint at a minimum was a major participant in the robbery and acted with reckless indifference to human life." (*Ibid.*) The People, however, contended the jury's "not true" finding showed only reasonable doubt as to the requirements for the special circumstance, and was not necessarily a finding that Flint did not act with reckless indifference to human life or was not a major participant in the felony, as required under subdivision (d)(2). (*Id.* at p. 614.)

The *Flint* court rejected the People's argument, noting the purpose of the resentencing proceedings is to decide issues not previously determined, not to retry " 'disputes that have already been resolved.' [Citation.]" (*Flint*, *supra*, 75 Cal.App.5th at p. 615.) In that context, the court reasoned: "The prosecution had an opportunity at the original trial to prove that Flint was a major participant in the robbery who acted with reckless indifference to human life. In enacting section [1172.6], subdivision (d)(2), the Legislature has determined that it should not have a second bite at the apple." (*Ibid.*)

24

The *Flint* court's "second bite at the apple" reference thus concerned the preclusive effect of the original jury's findings and has nothing to do with the trial court's authority to entertain a reconsideration motion after a section 1172.6 evidentiary hearing has been conducted.  Harris also cites *Flint* for the proposition that recent cases have established that the double jeopardy clause precludes prosecutors who lose at an evidentiary hearing from taking a "second bite at the apple."  Yet, *Flint* considered no such proposition.  In *Flint*, the trial court denied the defendant's petition at the prima facie stage.  (*Flint*, *supra*, 75 Cal.App.5th at p. 611.)  The *Flint* court had no opportunity to consider the parties' rights, or limitations on the trial court's authority, after the court has conducted an evidentiary hearing.

Indeed, to the extent the *Flint* court considered double jeopardy principles in connection with section 1172.6 resentencing proceedings, it rejected the petitioner's arguments.  The court rejected the defendant's contention that double jeopardy principles precluded the prosecution from introducing new theories not raised at the original trial.  It also adopted the reasoning of the court in *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 (*Hernandez*): " 'An evidentiary hearing under section [1172.6] . . . does not implicate double jeopardy because section [1172.6] "involves a resentencing procedure, not a new prosecution."  [Citation.]  The retroactive relief provided by section [1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause.' "  (*Flint*, *supra*, 75 Cal.App.5th at p. 618.)

25

Harris's reliance on other authorities is similarly misplaced.[8] Harris cites *People v. Del Rio* (2023) 94 Cal.App.5th 47, and *People v. Silva* (2021) 72 Cal.App.5th 505, for the proposition that a petitioner has the right to due process in a section 1172.6 proceeding. Yet, *Del Rio* and *Silva* both concerned procedural due process and a defendant's right to notice and the opportunity to be heard in the redesignation and resentencing process. (*Del Rio,* at p. 55 [due process violation to redesignate uncharged offense as basis for conviction without notice and opportunity to be heard, then resentence on the redesignated offense]; *Silva,* at pp. 523–524 [defendants entitled to notice of offenses for which they may be resentenced and opportunity to respond].)

Neither case considered the issue before us, namely whether the trial court has the authority to reconsider a ruling granting a resentencing petition prior to a new sentence being imposed. Further, Harris does not contend she lacked notice or opportunity to be heard. Indeed, the trial court provided significant notice prior to the further substantive resentencing proceedings, and the parties engaged in several rounds of supplemental briefing and hearings prior to the court's ultimate ruling changing its order and denying the petition.

Harris essentially contends the section 1172.6 proceedings are the equivalent of a criminal trial, with the attendant constitutional protections against double jeopardy. She suggests a trial court's interim finding that the People have not met their

---

[8]      Harris repeatedly cites *People v. Vance* (2023) 94 Cal.App.5th 154, however, the case is reported at 94 Cal.App.5th 706. It appears that Harris relies on a version of the opinion that was withdrawn and cannot be cited for any purpose.

26

burden of proof under section 1172.6, subdivision (d)(3) is the same as an acquittal at trial. However, as many other courts have concluded, resentencing under section 1172.6 does not implicate double jeopardy concerns. It is an ameliorative process and an act of lenity that does not result in a new trial or increased punishment, and therefore does not implicate many of the constitutional rights that apply to protect a defendant who has not yet suffered a final conviction.[9] (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1067–1068; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 588 (*Mitchell*); *Hernandez, supra*, 60 Cal.App.5th at p. 111; *People v. Myles* (2021) 69 Cal.App.5th 688, 704.) Harris has identified no statutory or constitutional impediment to the trial court exercising its inherent authority to reconsider its interim ruling concluding Harris was entitled to resentencing relief.

[[Begin nonpublished portion.]]

### III. The Trial Court Did Not Err by Denying the Petition
#### A. Standard of review

We review the trial court's order after an evidentiary hearing for substantial evidence. "In reviewing the trial court's

---

[9] In a supplemental letter to this court, Harris's counsel cited *Smith v. Massachusetts* (2005) 543 U.S. 462, as additional authority supporting the binding effect of a judicial acquittal under the Fifth Amendment's double jeopardy clause. In *Smith*, the United States Supreme Court held double jeopardy principles prohibited a trial court from reconsidering and reversing its midtrial acquittal of a firearm count for insufficient evidence. (*Id.* at pp. 465–475.) Because resentencing proceedings do not implicate double jeopardy concerns, *Smith* is inapposite to the trial court's reconsideration of its ruling in this case.

27

findings for substantial evidence, we apply well-settled principles. 'We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' [Citations.]" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.)

## B. Substantial evidence supports the trial court's finding that Harris is guilty of murder beyond a reasonable doubt

Harris contends the evidence was insufficient to support the trial court's finding that the People proved beyond a reasonable doubt that she directly aided and abetted the murder with express or implied malice.[10] We disagree.

---

[10] The trial court found that the People proved that Harris shared Christopher's intent to kill Alexander—in other words, that she possessed express malice. However, we may affirm the trial court's judgment on any basis presented by the record whether or not relied upon by the trial court. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [" ' "If right upon any theory of the law applicable to the case, [a ruling or decision] must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "].)

28

A person commits murder with implied malice when "the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) " 'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

"[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. ([*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 (*McCoy*).]) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. [Fn. omitted.] For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life. [Fn. omitted.]" (*People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 (*Powell*); *People v. Reyes* (2023) 14 Cal.5th 981, 990–991 (*Reyes*).)

Substantial evidence supports the conclusion that Harris directly aided and abetted the shooting with, at a minimum, implied malice. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107 ["The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act"].) The evidence established that Harris set up the meeting with Alexander, and that she did so with the knowledge that Christopher intended to kill Alexander at the meeting. Witness testimony, corroborated by phone records, reflected that Harris "chirped" Alexander numerous times, including minutes before his death, to bring him to the location of the shooting. Harris told a witness that she drove to the location, and a vehicle was seen leaving the scene matching the description of a vehicle that Harris sometimes drove. In Hardgraves's presence, Harris said she knew Alexander was going to be killed. (*Powell, supra*, 63 Cal.App.5th at pp. 712–713; see also *McCoy, supra*, 25 Cal.4th at p. 1120 ["In another shooting case, one person might lure the victim into a trap while another fires the gun . . . . [B]oth participants would be direct perpetrators as well as aiders and abettors of the other"].)

In addition to demonstrating consciousness of guilt, evidence of Harris's conduct after the shooting also bolstered a finding of implied malice. Harris told others that she kicked Alexander after Christopher shot him. She did not show concern for Alexander or seek help. (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978 [defendant's failure to ascertain the victim's condition or call emergency services after an assault "manifested a callous indifference to human life" sufficient for implied malice]; *People v. Cravens* (2012) 53 Cal.4th 500, 511 [defendant's conduct after fight bolstered finding of implied malice; defendant took no

30

steps to determine victim's condition or obtain emergency assistance, laughed about victim's injuries].)  Instead, the evidence indicated Harris took Alexander's phone after the shooting to avoid being linked to the murder.  Viewing the record in the light most favorable to the court's order, there is substantial evidence Harris acted with implied malice.

*Reyes*, *supra*, 14 Cal.5th 981, provides a helpful contrast. In *Reyes*, the defendant and other members of affiliated gangs began chasing a passing car on bicycles, near rival gang territory. (*Id*. at p. 985.)  During the chase, a gun was fired, striking the driver in the head and killing him.  A jury convicted Reyes of second degree murder.  (*Id*. at p. 986.)

Reyes petitioned the trial court for resentencing under section 1172.6.  The trial court denied the petition after an evidentiary hearing, finding beyond a reasonable doubt that Reyes committed second degree implied malice murder.  (*Reyes*, *supra*, 14 Cal.5th at p. 987.)  The court found the "act" Reyes committed that caused the death of the victim was his traveling to rival gang territory with several other gang members, one of whom was armed.  The court further found that Reyes committed that act with the mental state necessary for implied malice. (*Ibid*.)  The Court of Appeal affirmed.  (*Ibid*.)

The California Supreme Court reversed.  (*Reyes*, *supra*, 14 Cal.5th at pp. 989–990.)  It first found that no evidence established Reyes's conduct—traveling to a rival gang territory with other gang members—was a " 'substantial factor' " that proximately caused the victim's death.  (*Id*. at pp. 988, 989.)  It held that "acts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement.  There was no

31

evidence that Reyes's acts precipitated or provoked the shooting. And there is no reason to believe that the killing of [the victim] would not have occurred if Reyes had not accompanied his fellow gang members on the ride or participated in the chase." (*Id*. at p. 989.) Our high court further found that Reyes's act of traveling into rival gang territory with other gang members was not dangerous to human life, because it did not give rise to a " ' "high degree of probability that it will result in death" ' " required for implied malice murder. (*Ibid*.)

The high court in *Reyes* reviewed the trial court's order independently because it found the trial court misunderstood the elements of direct aiding and abetting implied malice murder, thus presenting a question of law. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) The trial court, by relying on the jury instruction for implied malice murder without reference to the elements of direct aiding and abetting, failed to evaluate Reyes's mental state concerning the life-endangering act committed by the direct perpetrator. (*Id*. at p. 992.)

Harris contends the trial court made the same legal error here. However, nothing in the trial court's order indicates it misunderstood or misapplied the elements for direct aiding and abetting implied malice murder. To the extent Harris is arguing the trial court failed to make certain factual findings in its order, the argument is foreclosed by the doctrine of implied findings. (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 525; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

Further, and in contrast to *Reyes*, substantial evidence established that Harris's conduct was a "substantial factor" that proximately caused Alexander's death. As described above, there

was evidence that Harris facilitated the shooting by contacting Alexander to set up the meeting and by driving her brother to the location. She engaged in both acts with the knowledge that Christopher intended to kill Alexander once they met. Here, there is reason to believe that the killing would not have occurred without Harris's participation. Taken together, the evidence supported a finding that Harris intended to aid her brother in the shooting, knowing Christopher planned to kill Alexander; her acts had a high probability of resulting in Alexander's death; and she acted in conscious disregard for his life through her conduct. (*Reyes*, *supra*, 14 Cal.5th at p. 989; *Powell*, *supra*, 63 Cal.App.5th at pp. 712–713.)

### C. The trial court did not apply the wrong legal standard in its evaluation of Hardgraves's recantations

Harris contends the trial court applied the "wrong legal standard" when evaluating Hardgraves's recantations of his trial testimony. Specifically, Harris contends the trial court improperly relied on three cases—*In re Roberts* (2003) 29 Cal.4th 726 (*Roberts*), *People v. Redmond* (1966) 246 Cal.App.2d 852 (*Redmond*), and *People v. McGaughran* (1961) 197 Cal.App.2d 6 (*McGaughran*)—to conclude that the unreliability of Hardgraves's recantations "elevate[d]" his otherwise inconsistent trial testimony to the status of proof beyond a reasonable doubt that Harris was guilty of murder.

Harris's contention lacks merit. The trial court did not rely on a "standard" from *Roberts*, *Redmond*, or *McGaughran* to conclude, as Harris suggests, that the unreliability of Hardgraves's recantations necessarily meant his trial testimony was sufficient proof beyond a reasonable doubt that Harris was

33

guilty of murder.  Rather, the trial court cited these cases for the narrow, well-established principle that recantations of sworn testimony are to be viewed with suspicion.

In *Roberts*, a witness recanted his testimony implicating the defendant in a murder, only to later retract his recantation. (*Roberts*, *supra*, 29 Cal.4th at pp. 739–740.)  Because the witness's recantation and subsequent retraction made it unclear whether his trial testimony or his recantation was false, our high court disagreed with an appointed referee's conclusion that the witness's trial testimony lacked credibility.  (*Id*. at pp. 742–743.) It reasoned that it would "not disturb the jury's verdict based upon a recantation that must be viewed with suspicion and was subsequently disavowed by [the witness]."  (*Id*. at p. 743.)

In both *Redmond*, *supra*, 246 Cal.App.2d at page 864, and *McGaughran*, *supra*, 197 Cal.App.2d at page 17, the reviewing courts found no abuse of discretion in trial court orders denying a motion for a new trial based on a witness's affidavit recanting prior trial testimony.  The decisions stated the general principle that ordinarily little credence can be placed on a witness's posttrial affidavit indicating the witness's prior trial testimony was false.

Here, once it was clear that Hardgraves's testimony was pivotal to the resentencing proceedings, the defense presented the court with Hardgraves's posttrial statements in which he purported to recant his trial testimony and exculpate Harris. The trial court was therefore tasked with evaluating whether these posttrial statements undermined Hardgraves's trial testimony.  In this context, the trial court appropriately applied the principle stated in *Roberts*, *Redmond*, and *McGaughran*, that subsequent recantations may be viewed with suspicion.

34

Ultimately, the trial court concluded that Hardgraves's posttrial statements did not undermine his sworn trial testimony. There is no basis for Harris's claim that the court misunderstood or misapplied the law and determined Hardgraves's recantations alone constituted evidence of Harris's guilt. Instead, the record reflects that the trial court appropriately assessed the credibility of Hardgraves's testimony, found the posttrial statements unpersuasive, and, on the strength of Hardgraves's trial testimony and other evidence, concluded the People met their burden to establish Harris's guilt beyond a reasonable doubt.

### D. There is no basis to conclude that the court failed to consider Harris's youth in evaluating her petition

Finally, Harris argues that reversal is necessary because the trial court failed to consider her youth when it concluded the evidence showed she possessed the requisite mental state for second degree murder. The record does not support her argument.

At the March 2022 hearing, Harris's counsel and the court discussed Harris's young age as a factor the trial court should consider when determining whether the People could prove beyond a reasonable doubt that she was guilty of murder under current law. Counsel informed the trial court that age "is a big factor in the cases that have been coming out in the court of appeals." The trial court acknowledged the relevance of youth and brain development in the formation of intent. Harris's counsel did not raise her age in further briefings, and neither counsel nor the court mentioned Harris's youth in any of the subsequent proceedings. Harris now contends the absence of further express discussion of her youth indicates the trial court

failed to consider her age as a factor when evaluating her petition.  We disagree.

A " 'cardinal principle of appellate review' " is that a " ' " 'judgment or order of the lower court is *presumed correct*[, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' "  [Citation.]' "  (*In re Julian R.* (2009) 47 Cal.4th 487, 498–499.)  A corollary to this rule is that " ' "a trial court is presumed to have been aware of and followed the applicable law.  [Citations.]" ' [Citation.]"  (*Id.* at p. 499.)

We presume the trial court followed the applicable law when it denied Harris's petition in October 2022.  At that time, the applicable law included multiple published appellate cases finding that youth is a relevant factor bearing on mental state in section 1172.6 petitions.  (Cf. *People v. Pittman* (2023) 96 Cal.App.5th 400, 416, 417 [it could not be presumed that the trial court implicitly considered youth where age was not raised below, and the court denied the petition *before* appellate courts decided the question].)  The earliest cases involved juvenile offenders. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 960; *In re Moore* (2021) 68 Cal.App.5th 434, 439, 453; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987, 991.)  But by the time the trial court denied Harris's petition in October 2022, the decision in *Mitchell*, *supra*, 81 Cal.App.5th 575, had also issued, which considered youth as a factor when evaluating the petition of a defendant who was 18 years old at the time of the underlying offense.  (*Id.* at pp. 584, 595.)

In March 2022, the trial court expressly indicated it was aware of ongoing developments in the law regarding youth and brain development as a consideration in resentencing cases.  In

the absence of any indication to the contrary, we must presume the court followed the law it had indicated it was aware of, and considered youth as a factor when evaluating Harris's petition. The lack of further express discussion of the factor does not change our analysis.

[[End nonpublished portion.]]

**DISPOSITION**

The order denying Harris's petition for resentencing is affirmed.

ADAMS, J.

We concur:

EGERTON, Acting P. J.

BERSHON, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.